## CIRCUIT COURT OF THE CITY OF RICHMOND

Commonwealth of Virginia

v.

John Cronin

## 1855

John H. Gilmer for the prisoner.

Marmaduke Johnson for the Commonwealth.

By JUDGE JOHN A. MEREDITH

If the witness be asked what the deceased stated touching her apprehension of death during the administration of the sacrament of penance, it necessarily raises the question of privilege which was so fully discussed before I adjourned the Court on Saturday; and as the Counsel has announced his purpose to propound the question when the witness is recalled, and has asked me to pass upon its competency, I will briefly assign the reasons which have led to the decision I have formed on an examination of the subject.

The question then is, whether a Roman Catholic priest shall be required to disclose what he has received in the sacramental confession? This disclosure the Rev. Mr. Theeling, the Romish Priest, has declined making, and in courteous and respectful terms has assigned the reasons which control his conduct. He has not hesitated to give all the evidence he knows as a private individual, and which he has obtained from those ordinary sources of information from which other witnesses derive theirs. It is only the secrets of the sacramental confession, and information entrusted to him in the sacred tribunal of Penance, that he declines to reveal.

It is a tenet of the Roman Catholic Church that Jesus Christ, the divine author of Christianity, has instituted seven sacraments, that the sacrament of penance, of which the sacramental confession is a component part, is one of these seven sacraments; and it is a doctrine of that Church, that the same divine author of these sacraments has laid the obligation of a perpetual and inviolable secrecy on the minister of that sacrament, and this obligation is enforced by an oath administered at the time of ordination.

Should the witness make the disclosure required of him, he would subject himself to the most serious penalties known to his church. 1. He would forever degrade himself in the eye of the Catholic Church. 2. According to the canons of that Church he would be divested of his sacerdotal character, replaced in the condition of a layman, and be forever disabled from exercising any of the ecclesiastical functions. 3. That if he lived in a country where the canon law prevailed, he would be liable to be lodged in close confinement to do penance for the rest of his life. 4. According to the dictates of his own conscience he would render himself guilty, by such a disclosure, of everlasting punishment in the life to come. Such would be the consequences to the witness according to the recognized rules of his Church.

I shall not pause to discuss how far those common law rules of evidence, which exempt a witness from answering questions, whose direct tendency is, to degrade his character, expose him to a criminal prosecution, or subject him to a pecuniary forfeiture. I do not think them applicable to this case. I cannot however, close my eyes to the dreadful predicament in which the witness stands; if he tells the truth he violates his ecclesiastical oath. If he prevaricates, he violates his judicial oath. If he answers yes, <u>punished</u> by the ecclesiastical law. If he answers no, <u>punished</u> by the municipal law. If he answers no, <u>punished</u> for judicial contempt. "Whether he lies, or whether he tells the truth he is wicked, and it is impossible for him to act, without acting against the laws of rectitude and the laws of conscience." If then it be found that the generally mild and just rules of the common law place the witness in this exquisite dilemma, between perjury on the one hand, and false swearing on the other, we must look to our own laws, to our constitution and bill of rights, which proclaim religious toleration and guarantee the free exercise of religious worship, and see if they do not view with a more liberal eye the religious feelings of our people, and dispense with a more equal hand the universal and immutable principles of Justice.

I shall consider this question in two aspects. 1. Upon authority, so far as adjudications in this country and England are to be found. 2. Upon principles of public policy, in connection with the guarantees furnished by our constitution in favor of religious liberty.

I. It is true as a general proposition, that every person is bound, when called upon in a Court of Justice, to testify whatever he may know touching the matter in issue. This is essential to the proper administration of civil and criminal justice; but it does not follow that a priest is bound to disclose what a penitent confessed to him in the exercise of a religious rite, which forms a fundamental tenet in the Church to which he belongs, and without which the Church would lose its distinctive features in the

estimation of those who profess its faith. The elementary writers state in the most unqualified terms that clergymen of no religious persuasion are exempt from the operation of the rule, yet when we examine the references they cite, it furnishes no authority for the proposition. It is a little remarkable that the whole range of English Reports furnish no case in which the question has ever arisen in respect to a Romish priest. This is a pregnant circumstance, and has strongly impressed me with the conviction, that the exemption of a Catholic priest is either a principle of law so well recognized there, that it has been deemed useless to make it the subject of adjudication, or that the relation of priest and penitent has been held so delicate and sacred, that no one had the hardihood to draw aside the veil, which conceals it from public gaze. When I reflect that the Catholic Church in that country has experienced every change of fortune, from the uncontrolled exercise of supreme power to the sufferings of an intolerant persecution, I can upon no other principle account for this utter absence of all authority on the point.

The only case cited by the elementary writers which seems to furnish authority for the proposition that clergymen of no religious persuasion, whether Protestant or Catholic, are exempt from disclosing confessions made to them, is a case reported in McNally, p. 253-255. In that case a bill was filed to recover the estates of the late Lord Dunboyne. The plaintiff claimed the same as heir at law, and alleged that the will under which the defendant claimed was a nullity, Lord Dunboyne having been a popish priest and having conformed and relapsed to popery, which deprived him of the power to make a will. Issue was joined, and the plaintiff called the Rev. Mr. Gahan, a clergyman of the Church of Rome, to be examined, and interrogatories to the following effects were, amongst others, propounded to him. "What religion did the late Lord Dunboyne profess from the year 1783 to 1792? What religion did he profess at the time of his death and a short time before?" The witness answered to the first part, but objected to the second, and assigned as a reason for his refusal that, his knowledge of the

matter enquired of, if any he had, arose from a confidential communication to him, in the exercise of his clerical functions, and which the principles of his religion forbade him to declare, nor was he bound by the laws of the land to answer.

Sir Michael Smith, the master of the Rolls, determined against the objection and required the witness to answer. This case is relied on as a direct authority on the point, but a careful examination of it will show that the question does not arise and was not decided. It will be observed that the fact enquired into of Mr. Gahan had not been communicated to him in the administration of a sacrament of his church, which in its nature is to be kept inviolably secret. The information was not obtained in the confessional. It was a confidential communication and the knowledge may have been derived by him from the ordinary sources of information, which daily association afforded.

He would not therefore be exposed by disclosing it, to degradation, breach of oaths, and a violation of clerical duties. It only affected his personal honor as a gentleman.

The point did not arise in this case, and the principle, which it is cited as authority to sustain, was not decided.

There are other cases cited in the elementary books, but an examination of them will show that they contain the mere loose dicta of judges upon the general question of exemption, when the precise point was not before them. Some of them in favor, and others against extending the privilege to all clergymen.

In the case of Broad v. Pitt, 3 C. and P. 518, Best, Chief Justice, said that "he, for one, would never compel a clergyman to disclose communications made to him by a prisoner. But that, if he chose to disclose them he would receive them." In the Case of Du Barre, Peake's nisi prius cases, p. 77, Lord Kenyon, on being informed that Mr. Justice Butler had required

a clergyman to disclose the confessions made to him by a prisoner, remarked, "I should have paused before I admitted the evidence here admitted." These opinions were expressed in respect to protestant clergymen, who do not hold such confessions to be sacred. But with how much more force do they apply in the case of Roman Catholic clergymen, according to whose religious creed, the confession is a sacramental rite.

So far then as the English authorities are concerned, the question has never been decided, and comes before me untrammelled by any English adjudication.

In the United States the question has been twice decided in favor of exempting a Roman Catholic priest from disclosing confessions made to him in this sacred relation.

The first case was an indictment for larceny. It was tried in the Court of General Sessions for the City of New York before De Witt Clinton, Mayor, J. Ogden, Hoffman, Recorder, and J. S. Douglass and R. Cunningham, sitting aldermen. The commonwealth to sustain the prosecution introduced as a witness the Rev. Mr. Kohlman, the Catholic priest, to whom the prisoner had confessed his guilt and delivered the goods to be returned to the owner. The witness upon being interrogated as to his knowledge of the transaction and the connection of the prisoner with it, objected to answering upon the ground, that all his information was obtained in the confessional, and claimed to be exempt from making the disclosure. The question on his privilege of exemption was elaborately argued, and after having taken time to consider of their opinion, the court unanimously decided that the witness should not be compelled to answer the question, and that the priest was not bound to disclose what was confided to him in the confessional.

The same point was subsequently presented in another case before the same court and decided in the same way. The question has never been adjudicated in any of the courts of last resort in the United States;

and the two decisions cited, whilst they are not binding as authority, are at least persuasive, and derive additional weight from the eminent and learned names connected with them.

Although there are no decisions in the higher courts of the United States affirming the principle that Catholic priests are privileged from disclosing what is made known to them in the confessional, yet they are privileged by express enactment in several of the States. By a statute of New York, 2 Rev. Stat. 496, § 72, it is enacted that "No minister of the gospel, or priest of any denomination whatsoever, shall be allowed to disclose any confessions made to him in his professional character in the course of discipline enjoined by the rules or practice of such denomination." A similar statute exists in Missouri, Rev. Stat. 1845, ch. 186, § 19; and in Wisconsin, Rev. Stat. 1849, ch. 98, § 75; and in Michigan, Rev. Stat. 1846, ch. 102, § 85; and in other states of the Union; and such is the law of Scotland. By a writer on Scotch Criminal Law it is remarked: "But our law utterly disowns any attempt to make a clergyman of any religious persuasion whatever divulge any confessions made to him in the course of religious visits, or for the sake of spiritual consolation, as subversive of the great object of punishment, the reformation and improvement of the offender." (Alison C.L.S.)

II. Is this privilege embraced in the guarantees furnished by our Constitution in favor of religious toleration, and does it violate any principle of public policy?

The Constitution of the United States provides that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Our Bill of Rights declares that, "religion, or the duty we owe to our Creator, and the means of discharging it, can be directed only by reason and conviction, not by force or violence; and therefore all men are equally entitled to the free exercise of religion, according to the dictates of conscience"; and our Constitution enacts that, "no man shall be

compelled to frequent, or support any religious worship, place or ministry whatsoever; nor shall any man be enforced, restrained, molested, burthened in his body, or goods, or otherwise suffer on account of his religious opinions or belief; but all men shall be free to profess, and by argument to maintain their opinions in matters of religion, and the same shall in no wise affect, diminish, or enlarge their civil capacities."

It is impossible to conceive of more broad and comprehensive terms than are used in our Bill of Rights, and our State and Federal Constitutions. Religious toleration was the great purpose their framers had in view. They believed that it was the right of every human being to worship God according to the dictates of his own conscience. They designed to secure forever to all, the free exercise and enjoyment of religious profession and worship, and employed language commensurate with that object. At the time they adopted these constitutional provisions in favor of religious liberty, the Catholic religion was in existence and had been for centuries. Penance was one of its sacraments, and confession an essential part of that sacrament. They enacted these provisions with full knowledge of this fact, and must have intended that the Catholics should freely enjoy their religion, including auricular confession. If they had intended to restrict the Catholics in their mode of worship, to deprive them of the sacramental confession, and thus strike out a fundamental tenet in their creed, would they not have used some words of limitation on the broad and comprehensive terms they employed? By every rule of construction I am forced to conclude that they would have imposed this restraint if they had intended to do so. If, then, the common law rule of evidence, which requires a witness to disclose all he may know touching a matter in issue before a court of justice, infringes upon that free exercise of religious worship, which the Bill of Rights proclaims and the Constitution guarantees, no one will deny but that the rule of evidence must yield to the constitutional enactment. Being a rule of evidence in existence at the time of the adoption of the Constitu-

tion, it is repealed by any provision in the Constitution with which it comes in conflict; and the enquiry then is, does this rule of evidence restrict those who profess the Catholic religion in the free exercise of their religious rights and privileges. In making this enquiry we must ever keep in mind that it is essential to the free exercise of a religion, that its ordinances and ceremonies should be administered, and those who observe them should be protected; and that the sacraments of a religion are its most essential elements. What then would be the consequence to the Catholic religion of requiring the priest to disclose what is entrusted to him in the sacramental confession? Would any such confessions be made? Clearly not. No criminal would seek the confessional, and in the act of penance make known his crime, if the priest to whom he discloses it, is liable to be called as a witness to testify on his trial and ensure his conviction. These confessions which are now delivered in secret for a purpose purely religious would not be so delivered, but would be withheld for fear lest they should be used for a judicial purpose. The rule of evidence, which would enforce the disclosure of confessions made to a priest, would operate as a prohibition of all such confessions for spiritual purposes as could be used for judicial purposes; and this prohibition would be secured by whatever consequence of a penal character would result from the decision, which such testimony would warrant. Penitents would be pressed by the whole weight of the penal branch of the law, and be prohibited from the exercise of this essential and indispensable part of their religion in confessing all such misdeeds as, if judicially disclosed, would have the effect of drawing down upon them the punishment of the law. The consequences to the priest would be equally oppressive. To him it would be little short of persecution. What priest would receive the confession of a penitent, when the dilemma in which he would be placed is so terrible? When brought to the witness stand, he must either violate the oath administered to him by giving false testimony, or by disclosing what he has received in the confessional, violate the ecclesiastical oath administered at the time of his ordination, or by his silence be

"burthened in his body" by commitment for contempt. Is it not manifest that, neither the Priest will administer the sacrament of penance, of which the confession is an essential part, nor will the penitent receive it, when both are liable to such terrible consequences? And if this restraint be imposed upon them, can they be said to enjoy the free exercise of their religion, being denied the right to partake of one of its sacraments? In the Protestant church, there are but two sacraments, Baptism and the Lord's Supper. They are essential to the full enjoyment of that faith. Now suppose that a decision of this court, or a law of this State, or a common law rule of evidence, should prevent the administration of one or both of these sacraments, would not the Constitution be violated and the freedom of religion be infringed? and must not the same privilege apply to the Catholic church? Any law, or rule of evidence, which prevents the administration of any one of its sacraments to those who profess its creed, is equally a violation of the Constitution, and a denial to them of the free exercise of that religious freedom which the Constitution secures alike to all.

Nor will this prohibition upon the free enjoyment of the Catholic religion by requiring its ministers to testify as to what may be disclosed to them in the confessional, be confined in its operation to cases of crime. It will extend to civil proceedings; and every suitor, whose adversary is a Catholic, and whom he suspects of having made disclosures in the confessional, touching the subject of controversy between them, will have the right to bring the priest into court to testify to matters confided to him in that sacred relation. The alarm which this practice would create among that class of our people would be intense, and to them a most extreme and afflictive grievance. And thus those who profess this faith, will be subjected to a species of apprehension, and of petty annoyance and vexation utterly inconsistent with the enlarged and enlightened toleration of our laws.

Nor will any principle of public policy be violated by extending this privilege of exemption to

the Catholic clergy from testifying to matters made known to them in the sacramental confession. The advantage gained in promoting the ends of criminal justice by coercing a disclosure from the priest would be of rare occurrence. And whilst cases may be supposed in which the concealment of a fact communicated in penance might have a pernicious effect, yet such instances are rare, and furnish no foundation for the rule that they should be required to disclose in all cases. It has been truly said, that "to attempt to establish a general rule, or to lay down a general proposition from accidental circumstances, which occur but rarely, or from extreme cases, which may sometimes happen in the infinite variety of human actions, is totally repugnant to the rules of logic and the maxims of the law. The question is not whether penance may sometimes communicate the existence of an offense to a priest, which he is bound by his religion to conceal, and the concealment of which may be a public injury, but whether the natural tendency of it is to produce practices inconsistent with the public safety," and whether public policy requires the disclosure? To require such disclosure from the priest would be to declare, as I have already shown, that there should be no penance and no confession. For who would confess, when the sanctity of the sacrament of penance is to be invaded and its secrets exposed to public gaze? To enforce the rule of evidence which requires such disclosures, would be to destroy the source itself of all such evidence -- and the supposed public benefit would share the same fate -- and thus the rule would defeat itself, whilst the effort to enforce it would inflict a grievous, continuous and unconstitutional injury on those to whom it is sought to be applied.

It can scarcely be necessary to notice the argument which was pressed, that this exemption of Catholic clergymen would be extending to them a privilege not enjoyed by clergymen of the protestant persuasion. No Protestant claims any such exemption, and they cannot be said to be denied that which they lay no claim to. Penance and the confessional form no part of their religious creed. They repudiate both. When this rule of evidence, or any other principle

of law, shall deprive Protestants of one of the sacraments of their Church, and thus deny to them the "free exercise of their religion according to the dictates of conscience," they should be held exempt from the operation of any such rule, or principle of law. But until such is shown to be the case, there is no analogy between Protestants and Catholics on this question, such an argument is rather more popular than logical; and though it may be invoked to excite prejudice, should never be allowed to disturb the judgment.

This privilege of withholding what is made known in the confessional is not without analogy in the law to sustain it. It belongs to every attorney or counsellor at law. All professional communications made to attorneys by clients are privileged, and no human power can compel the attorney to disclose them. Whether he be called as a witness, or be made a defendant and a discovery sought from him as such, by bill in Chancery, whatever he has learned as counsel or attorney, he is not obliged, nor permitted to discover; and by the attorney's withholding such knowledge the innocent may suffer the extreme penalties of the law and the guilty go unwhipt of justice. "The foundation of this rule," said Lord Chancellor Brougham, in the case of <u>Greenhough</u> v. <u>Gaskell,</u> 1 My. and K. 102, "is not on account of any particular importance which the law attributes to the business of legal professors, or any particular disposition to afford them protection. But it is out of regard to the interests of justice, which cannot be upholden, and to the administration of justice, which cannot go on, without the aid of men skilled in jurisprudence, in the practice of the Courts and in those matters affecting rights and obligations, which form the subject of all judicial proceedings." If such communications were not protected, no man, as the same learned judge remarked in another case, would dare to consult a professional adviser, with a view to his defense, or to the enforcement of his rights; and no man could safely come into Court, either to obtain redress, or to defend himself. With how much more force does such reasoning apply to those who seek the aid of

spiritual advisers, and whose religious creed attaches essential importance to their interposition.

It will be observed that I have not discussed this as a theological question. Whether it be, as alleged, of divine origin or not; whether repentance and consequent abstinence from future misdeeds of the like nature, followed by satisfaction more or less adequate for the past, are temporal advantages quite as extensive as the good effects to be derived from the disclosure as an aid to the administration of justice, are views which I shall not enlarge upon. But assuming penance and confession to be a sacrament in the Catholic Church, and a tenet of faith essential to the maintenance of that religion, I have considered it in its legal and constitutional bearings. And in every aspect in which I have been able to view it; looking at it as analogous to the rule which exempts attorneys from disclosing the professional communications of their clients entrusted to their confidence; to the fact, that in England during centuries whilst the Catholic religion prevailed there no case can be found in which the disclosure was coerced; that it is the law of Scotland, as it is the law in several states of this union by express statutes to exempt the priest from disclosing information obtained in the confessional; that no principle of public policy will be invaded; and above all, that the great constitutional boon of religious toleration, which secures to all the "free exercise of religion according to the dictates of conscience," cannot be enjoyed by this class of our people if the secrets of the confessional are to be disclosed, I shall hold the priest exempt from testifying as to what was confessed to him by the deceased in the administration of the sacrament of penance.